UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------X
EXCHANGE LISTING, LLC,                          :

              Plaintiff,             :
     Index No.:                                :        Case No. 1:21-cv-07557 (KPF)
                        :

                        :
     -against-
                        :
INSPIRA TECHNOLOGIES, LTD., A/K/A
INSPIRA TECHNOLOGIES OXY B.H.N.   :
LTD.
                        :
            Defendant.
---------------------------------------------------X

## AMENDED COMPLAINT

Plaintiff Exchange Listing, LLC ("Exchange") or ("Plaintiff"), by and through its attorneys PULLP, alleges as follows:

## NATURE OF PROCEEDINGS

1.    This is a case where both parties agree.  In fact, "*agreed*" is Defendant's own word for it. Defendant has already stated what it owes to the Plaintiff, and has done so publicly, in an SEC filing.  Specifically, in Defendant's F-1 prospectus for its IPO, dated July 13, 2021, Defendant states as follows (on p. 59, attached hereto as Ex. 1):

> **We agreed to issue to Exchange Listing, LLC, in consideration for their advisory and consulting services, 73,321 Ordinary Shares upon our initial public offering on the Nasdaq Capital Market.**

2.    Exchange Listing, LLC (Plaintiff) also contends that it is (minimally) owed 73,321 Ordinary Shares in consideration for Plaintiff's advisory and consulting services.

3.    Defendant has not issued 73,321 Ordinary Shares to Plaintiff.

4.   Defendant's initial public offering ("IPO") on the Nasdaq Capital Market ("Nasdaq") occurred on or about July 14, 2021.

5.   Again, there can be no dispute that Defendants "agreed to issue to Exchange Listing, LLC, in consideration for their advisory and consulting services, 73,321 Ordinary Shares," or that the time for those shares to be issued was "upon [Defendant's] initial public offering on the Nasdaq Capital Market."

6.   Presumably, the Directors and Officers of Defendant would not permit materially false publicly filed statements in their F-1.   To do so would be to deliberately mislead the public with a material representation.

7.   That would be tantamount to multiple securities fraud violations, and would be courting a number of potential lawsuits, from private class actions to state regulators and SEC Enforcement.

8.   Thus, Defendant either (a) knowingly and intentionally caused material misstatements about its shares and its IPO to be publicly disclosed; or (b) Defendant agreed to issue to Exchange Listing, LLC, in consideration for their advisory and consulting services, 73,321 Ordinary Shares on or about July 14, 2021.

9.   Presumably, Defendant did not intentionally cause a material misstatement to be made in connection with its IPO, much less leave it there unchanged and knowingly false for months.

10.   Thus, the only reasonable conclusion is that Defendant meant what it stated publicly, and has therefore *already (publicly) admitted liability in this matter*.   Any arguments to the contrary are frivolous, and a waste of this Court's time.

## THE PARTIES

11.   Plaintiff is a limited liability company which does business in, among many other locations, the state and county of New York.

12.     Upon information and belief, Defendant is an Israeli Limited Company trading publicly on the Nasdaq market as IINN.  IINN is a specialty medical device company developing proprietary respiratory support technology designed to prevent the need for mechanical ventilation which is the current standard of care.  IINN is based in Raanana, Israel.

<u>**JURISDICTION AND VENUE**</u>

13.     Jurisdiction is proper because the Agreement at issue contains a clause specifying that New York is the exclusive jurisdiction for all disputes arising under the contract, matters pertaining to the transaction, and activities contemplated by the contract and transaction.  Both parties transact business in the State of New York, and did so in connection with the IPO at issue in this case.

14.     The transfer agent (where the shares at issues were held) is VStock Transfer, and VStock is located in the State of New York.  Similarly the bankers in question providing services to Defendant were in New York, and the roadshow (done virtually) was done from New York located computers.  Both parties had meetings about the subject matter of this litigation with each other and other New York parties in the state and county of New York and Defendant's legal counsel for the IPO has its principal office in New York.

15.     Venue was proper in New York State Supreme Court, New York county because (i) the IPO itself took place in this county; (ii) Defendant is listed on the Nasdaq in this county; (iii) all the parties do business in this county; (iv) the escrow funds for the IPO were held in a bank in this county; (v) Defendant met with bankers in this county; and (vi) the virtual road show was worked on in this county.

16.     Defendant subsequently removed to this Court, with no objection from Plaintiff.

**FACTS**

17.   In or about September, 2020, Defendant fraudulently induced Plaintiff into entering into a contract with Defendant (the "Agreement", See Exhibit 2), by which Defendant retained Plaintiff as a consultant to Defendant.

18.   Plaintiff was duped into providing an array of capital markets services, enabling Defendant to better achieve its financial goals of trading on Nasdaq Capital Markets ("Nasdaq") through an initial public offering of the Defendant's securities (the "IPO").

19.   Prior to entering into the Agreement, Plaintiff had a number of discussions with Defendant about Defendant's desire to become a publicly listed company on the Nasdaq.

20.   An IPO is a complicated process, especially for international companies like Defendant, and Plaintiff specialized in helping companies like Defendant obtain a public listing on the Nasdaq Exchange (hence Plaintiff's name, Exchange Listing).

21.   A company cannot merely sign a form and become a Nasdaq Exchange listed company.

22.   The process is tedious, time consuming, and takes significant effort.

23.   Unfortunately, there are no guarantees in life, much less in finance and capital markets. Despite the entire process and the significant effort, not every company that attempts to IPO is successful.

24.   The parties sought to work out an arrangement where Plaintiff would be compensated far more if a successful IPO occurred than if one did not.  Plaintiff refused to take the risk that it would earn nothing for an unsuccessful raise, but was willing to accept a deal whereby it earned more for a successful IPO than one which was successful.

25.   Defendant proposed a plan – a success fee to incentivize Plaintiff into working hard to ensure Defendant's IPO was successful, and a good faith 75% of that same fee if the IPO was unsuccessful.

26.   Primarily in September, 2020, the parties had a number of Zoom meetings about this.

27.   The participants in these Zoom meetings were Joe Hayon and Dagi Ben-Noon (from Defendant) and Jonathan Blum and Gregg Jaclin from Plaintiff.

28.   Joe Hayon and Dagi Ben-Noon presumably were somewhere in Israel during these Zooms, but given the nature of a Zoom meeting no more specificity as to their locations during these meetings is possible.

29.   Blum and Jaclin participated from New Jersey, also via Zoom.

30.   There was one Zoom meeting right after Labor Day, during the week of September 6, 2020.

31.   There were two Zoom meetings the week of September 13th, 2020, and another two Zooms the week of September 20th, 2020.

32.   By the end of that week, the parties were attempting to finalize the agreement and put it into writing.

33.   During each of the Zoom meetings described above (that took place the weeks of September 6th, 13th, and 20th of 2020 between the parties above in the locations above), Joe Hayon proposed a plan to Plaintiff, stating that as long as Plaintiff did the work required, Plaintiff would minimally receive a minimum amount in cash, plus 75% of the main success fee, and 75% of the total warrants in the event of a successful IPO.

34.   This statement was false when made.

35.   Hayon made this statement with intent to dupe Plaintiff into later signing the Agreement, which intentionally did not accurately reflect these statements.

36.    Hayon made this statement with intent to dupe Plaintiff into providing its services for free.

37.    Plaintiff reasonably relied, to its detriment, on these statements.

38.    But for the promise of a "floor" of 75% of the total success fee, Plaintiff never would have started work.

39.    During each of the Zoom meetings described above (that took place the weeks of September 6th, 13th, and 20th of 2020 between the parties above in the locations above), Joe Hayon stated what he considered the "successful IPO provision," stating "if the company had a successful IPO and become listed on Nasdaq, [Defendant] would give [Plaintiff] base cash, warrants and at least 200,000 post-IPO, (possible split adjusted) Ordinary Shares.

40.    This statement was false when made.

41.    Hayon made this statement with intent to dupe Plaintiff into later signing the Agreement, which intentionally did not accurately reflect these statements.

42.    Hayon made this statement with intent to dupe Plaintiff into providing its services for free.

43.    Plaintiff reasonably relied, to its detriment, on these statements.

44.    But for the promise of at least 200,000 post-IPO (possible split adjusted) Ordinary Shares in the event of a successful IPO, Plaintiff never would have started work.

45.    Defendant never intended to go through with this plan.

46.    Defendant was actually planning to benefit from Plaintiff's services until the last minute, and then to dump Plaintiff at the last minute, once Defendant was close enough to successfully IPO without Plaintiff's help.

47.    Defendant hid from Plaintiff that it had not intent to ever compensate Plaintiff.

48.    Defendant hid from Plaintiff that it planned on switching investment banks once everything else had been accomplished, and then using that as an excuse to not pay Plaintiff anything.

49.     Defendant knew the statements above were false when made, yet made them anyway, with intent to dupe Plaintiff into working for free.

50.     Reasonably relying on Defendant's deceptive statements detailed above, Plaintiff signed the Agreement and began exhaustive work on Defendant's then-potential IPO.

51.     As detailed below, although Plaintiff performed its obligations under the Agreement, and then some, Plaintiff has not received the compensation to which it is entitled.[1]

52.     Meanwhile, Defendant received the extensive consulting services.

53.     The Plaintiff's services were directly responsible for Defendant's IPO, with Defendant now trading on Nasdaq under the ticker symbol IINN.

54.     Specifically, Plaintiff provided advisory services to Defendant in the areas of corporate development and, corporate finance.

55.     Plaintiff worked closely with Defendant, assisting in multiple areas in preparation for the IPO.

56.     These areas included, but are not limited to: general capital markets advisory services, compiling materials which were used for the virtual road show, filing the Nasdaq listing application and addressing the comments with Nasdaq.

57.     But for this work, no IPO could have occurred.

58.     But for this work, Defendant would not be trading on Nasdaq right now.

59.     The full scope of the contractual work is detailed in the Agreement undersection 1(C), although Plaintiff did more than what is set forth in the Agreement.

---

[1] On September 14, 2021 (in a transparent attempt to defend against a result where Plaintiffs are the prevailing party but only in a small amount), approximately **one month after** Plaintiff filed this lawsuit, Defendant issued 4,082 shares to Plaintiff.

*Scope of Work.*

1. Capital Markets Advisory – Provide an array of capital markets services, enabling the Company to better achieve its financial goals of trading on Nasdaq Capital Markets ("Nasdaq") through an initial public offering of the Company's securities (the "IPO") within the preliminary timeline attached hereto as <u>Schedule A</u>. Specific scope of services:

1.1. Assist the Company with a capital markets road map, including strategy, development and execution;

1.2. Assist the Company with structuring its capitalization table and preparing for the IPO;

1.3. Introduce the Company to investment bankers (the "Introduced Bankers") to underwrite the IPO;

1.4. Introduce the Company to the service providers required for the IPO including legal counsel,accounting/auditing firms, transfer agent, Edgar agent, investor relations firms and others;

1.5. Assist the Company with preparation of its Registration Statement to be filed with the Securities andExchange Commission ("SEC") legal review and responding to comments for same;

1.6. Manage the Nasdaq listing application process;

1.7. Render advice on the structuring of a financing, assisting the Company in identifying andworking with selected investors, placement agents and/or underwriters; and

1.8. Review the Company's financial position and projections relating to the Company's capitalrequirements, analyzing the pro forma effects of a financing on such projections.

2. Organizational Meetings. Weekly organizational meetings with the "working" team to review developments,discuss any potential challenges and establish action steps, results, timelines and responsibilities.

3. NASDAQ Listing Advisory.

3.1. Assist the Company with structuring its capitalization table and preparing for the IPO; and

3.2. Assist and advise management with the public listing of the Company in complying with all listingrequirements and as well as filing the Nasdaq listing application and managing the application process.

4. Corporate Governance.

4.1 Assist the Company with development of its Corporate Governance policies;

4.2 Assist the Company with creation and adoption of Corporate Governance manual; and

4.3 Assist the Company with development of its Corporate Governance Certification documents.

60.    The term of the Agreement was defined as follows:

<u>**TERM.**</u> The term of this Agreement (the "Term") shall commence on the execution date and unless terminated in accordance with the terms and

conditions herein shall continue for a period of no less than six (6) months or until the Company is trading on NASDAQ Capital Markets, or as otherwise extended by both parties.

61.     The Plaintiff's compensation was defined as follows:

**COMPENSATION.** The Company agrees to compensate the Consultant in the following manner as consideration of the Services to be rendered hereunder:

Upon execution of this Agreement, the Company will issue the Consultant, 150,000 warrants (the "Warrants") exercisable at a price per share equal to the valuation set forth in the Company's Safe Financing, as defined below, or at an exercise price of $4.00 per share, if the Company does not complete a Safe Financing. The Warrants will have a five (5) year term. The warrants will become immediately exercisable upon a takeover, sale, merger, or similar such transaction involving a change of control of the Company. The Company agrees to include the shares underlying the Warrants in the registration statement to be filed by the Company with the SEC. The Warrants shall have a cashless exercise provision in the event that the shares underlying the Warrants are not registered in an effective registration statement

Subject to either of: (i) the closing of a financing of at least $1,500,000 (the "Safe Financing) within the specified timeline attached hereto as <u>Schedule A</u>, or (ii) the Company's retention of any of the Introduced Bankers with whom the company completes an IPO within 12 months, and unless this Agreement is terminated as provided in Section 9 hereof, as additional compensation, the Company agrees to compensate the Consultant as follows:

**A. $5,000 per month with such amount to commence accruing upon retention of an Introduced Banker and with the payments to commence upon completion of the Safe Financing;**

**B. A bonus of $25,000 upon completion of the Safe Financing;**

**C. $50,000 payable at such time as the Company completes the IPO;**

**D. The Company will issue the Consultant, shares of the company's common stock at such time as the Company completes its IPO in accordance with the fee schedule set forth in Schedule B attached hereto, and pursuant to the terms and conditions this Agreement. The Company agrees to include the shares of common stock in the registration statement to be filed by the Company with the SEC; and**

**E. The Company shall promptly reimburse Consultant for any pre-approved costs and expenses incurred by Consultant in connection with any Services performed by Consultant pursuant to the terms of the Agreement.**

**All Compensation as per this Section 4 including cash and stock to be**

**issued at the time of the IPO, shall be owed and immediately payable to Consultant upon either of: i) a takeover, sale, merger, or similar such transaction involving a change of control of the Company; or ii) should the Company elect not to pursue or otherwise complete an IPO with a Company valuation equal to or greater than $35 million subject to the provisions set forth in Section 9.**

62.  Defendant never terminated the Agreement.

63.  The services were performed in full, whether pursuant to the Agreement or because that was what the parties intended Plaintiff's role to be in the Zoom meetings.

64.  Plaintiff introduced many service providers and investment banks (defined in the Agreement as an "Introduced Banker.")

65.  The Introduced Bankers included, but were not limited to: Northland Securities, Ladenburg Thalmann, Maxim Group, Kingswood (now EF Hutton), HC Wainwright, ThinkEquity (Fordham Financial Management), Alliance Global Partners, Craig-Hallum, Lake Street Securities, The Benchmark Company, LLC, and Univest Securities.

66.  Defendant chose one of the Introduced Bankers – The Benchmark Company, LLC ("Benchmark") to be its lead underwriter for the IPO.

67.  During this time the parties continued their Zoom meetings, usually having one Zoom meeting per week to go over status and progress towards the IPO.

68.  At the beginning of April, 2021, after Plaintiff's services were mostly completed, Defendant terminated its dealings with Benchmark.

69.  On April 15, 2021, the parties met in person instead of over Zoom.

70.  Jonathan Blum and Gregg Jaclin met with Joe Hayon and Dagi Ben-Noon at Del Friscos Double Eagle Steakhouse in New York at 6pm on April 15, 2021.

71.  They were at dinner for about 2 hours.

72.  At about 6:45 Miri Segal from MS-IR, LLC joined the parties for dinner.

73. This firm handled IR for Inspira and Miri Segal was the main point of contact at the firm.

74. The reason that Joe Hayon and Dagi Ben-Noon came to New York was to meet both with Benchmark as well as National Securities Corp. ("National").

75. Defendant had terminated Benchmark for failure to close the IPO, and were looking to engage National as their new banker.

76. Plaintiff arranged a meeting for Defendant with Mike Jacobs at Benchmark during this trip, because the parties were trying to figure out a way Benchmark could still participate in the IPO as a syndicate member.

77. The dinner was very amicable.

78. The parties spent a good amount of the time talking about Israel, Joe Hayon and Dagi Ben-Noon's time in the Israeli Army, and their families.

79. The parties also spoke about the upcoming IPO, and moving forward with National or another banker.

80. The parties spoke about the underwriter counsel that Plaintiff had arranged for, Lucosky Brookman, LLP ("Lucosky"), because Defendant wanted to keep Lucosky as underwriter counsel.

81. Lucosky had acted as Benchmark's counsel, and Defendant thought it would be seamless to slide in a new underwriter as long as the new underwriter used the same underwriter counsel.

82. Plaintiff agreed to assist with this, and did so.

83. Lucosky acted as counsel for National.

84. The parties also discussed the success fee Defendant would owe to Plaintiff if the IPO in fact successfully closed, but with National or another banker as opposed to one introduced by Plaintiff.

85.   There was some disagreement, as Plaintiff understood that they would be entitled to a full success fee if the deal was successful.

86.   Joe Hayon stated that Plaintff would get 75%, and not 100%, of its fees, since Plaintiff had not introduced the "final" banker for the deal.

87.   Joe Hayon stated that Plaintff would receive approximately 75,000 Ordinary Shares.

88.   Plaintiff believed it was entitled to more, but did not want to fight at the dinner.

89.   Joe Hayon stated that Plaintiff should continue helping him build towards the upcoming IPO. As consideration Mr. Hayon offered a minimum amount, or floor, of approximately 75,000 Ordinary shares.

90.   Blum and Jaclin accepted this verbal offer while at the dinner, and continued providing services as consideration for the approximately 75,000 Ordinary Shares over the next few months.

91.   The F-1, on pg. 59, was written confirmation of this oral agreement reached during the April 15th dinner – 73,321 is, clearly, approximately 75,000.

92.   The remainder of the conversation was more of what was usually discussed in the Zoom meetings –  how Plaintiff could continue to assist with the IPO, since there was a new verbal agreement.

93.   Plaintiff paid for the meal, which it plainly would not have done if there was any hint that Defendant was planning on refusing to pay Plaintiff.

94.   Everything seemed to going well in the lead up to the IPO.

95.   In fact, Defendant sent a WhatsApp to Jonathan Blum and Gregg Jaclin on July 13th to let Plaintiff know that the IPO had closed.

96.     Jonathan Blum then spoke to Joe Hayon shortly after the IPO closed, and Joe Hayon stated that the shares and cash would be sent one week later.

97.     Blum sensed that he and Hayon were celebrating after Plaintiff had delivered a successful IPO for Defendant – which, of course, it had.

98.     There was nothing in the conversation to indicate that Plaintiff was not going to be paid.

99.     The payment, however, never came.

100.    After many months of working with Benchmark, Defendant had at the end switched to Aegis Capital ("Aegis"). The IPO was consummated on July 14, 2021 with Aegis in the lead spot.

101.    Section 9 of the Agreement contemplates Consultant receiving compensation even if the Agreement were terminated (it was never terminated) and even if the IPO were consummated by a banker other than an Introduced Banker, as follows:

> **9. TERMINATION**
>
> Subject to the compensation below, should the Company not complete the Safe Financing within the specified timeline attached hereto as <u>Schedule A, the Company may provide written notice to terminate the Agreement within 30 days. In such a case of not completing the Safe Financing, the Consultant will only be entitled to the</u> 150,000 Warrants defined in section 4. The Consultant will not be entitled to any further remuneration or compensation of any type per herein the Agreement.
>
> If so terminated, the Company is still obligated to pay the cash and stock compensation owed under this Agreement at the following rates: (a) if an IPO is consummated within 12 months through an Introduced Banker, 100% of the compensation set forth in section 4; (b) if the IPO is consummated with a banker other than an Introduced Banker and: (i) if the IPO is consummated within six (6) months of termination, seventy-five percent (75.0%) of the compensation set forth in section 4; (ii) if the IPO is consummated in months seven (7) through twelve (12) post-termination, fifty percent (50.0%) of the compensation set forth in section 4; and (iii) if the IPO is consummated after twelve (12) months post-termination, no compensation will be owed to Consultant.

102.    The F-1 prospectus for the IPO, dated July 13, 2021, states as follows on p. 59, confirming

the parties oral agreement from the April 15th dinner:

> **We agreed to issue to Exchange Listing, LLC, in consideration for their advisory and consulting services, 73,321 Ordinary Shares upon our initial public offering on the Nasdaq Capital Market.**

103.    Thus, the only question is whether Defendant only owes 73,321 shares, or owes far more

shares.

104.    The IPO took place on July 14, 2021.  No time had elapsed since termination, since no

termination occurred.

105.    It is not clear why 73,321 was chosen.

106.    Presumably, this figure is Joe Hayon's calculation of 75% of what the success fee should be,

as he stated at the April 15th dinner.  Mr. Hayon had estimated "approximately 75,000" at the

dinner, but he did not explain this precise number.

107.    Despite the work performed for Defendant and despite the successful completion of the IPO,

Plaintiff had, at the time of filing this action, not received any fees or shares or other

compensation from Defendant.

108.    But for Plaintiff's work, the IPO could not have occurred.

109.    If 73,321 is owed, that is simple, but the written contract calls for much more.

110.    A Table showing the calculation for Plaintiff's compensation based on the written contract is

annexed hereto as Exhibit 3.

111.    Plaintiff is owed 189,000 shares.

112.    Plaintiff is owed 12,000 shares from its warrant conversion.

113.  Plaintiff is owed $95,000 cash compensation as set forth in 30-32 below.

114.  $50,000 was due upon completion of the IPO.

115.  Four months retainer at $5,000 per month is owed, for a total of $20,000.

116.  $25,000 was owed as a bonus due upon completion of the SAFE financing.

117.  Defendant's failure to remit the above payments constitutes a unjust enrichment, *quantum meruit*, and money had & received. In the alternative, it is a breach of contract (both the written and the oral contracts).  The above also raises claims for fraud and fraud in the inducement.

### First Cause of Action (Fraud in the Inducement)

118.  Plaintiff repeats and realleges all the allegations set forth above as if set forth in full detail herein.

119.  Defendant knew that Plaintiff would not start work unless the deal included some guarantee of some payment in the event of an unsuccessful IPO.

120.  Defendant promised a "floor," so that no matter what, Plaintiff would receive some compensation.

121.  At the time Defendant promised the floor of 75%, the Defendant knew it had no intent of paying Plaintiff anything.

122.  At the time, Defendant actually intended to use Plaintiff to do almost everything needed to IPO, and then to switch investment banks at the last minute and not pay Plaintiff anything.

123.  Defendant knew its promise of a Floor was false, and made it because it knew how important it was to Plaintiff.

124.  Defendant promised a floor in order to induce Plaintiff's reliance, and it worked.

125.  Plaintiff reasonably relied on Defendant's promise of a Floor of 75%.

126.  But for this "floor" payment, Plaintiff never would have spent so much time working on Defendant's IPO.

127.  Plaintiff suffered damages in the form of hours worked for no pay.

128.  These damages were caused by Defendant's misrepresentation and omission.

129.  Defendant knew that Plaintiff had a reasonable expectation of compensation for its services.

130.  The reasonable value of the services Plaintiff provided is $1,000,000 plus interest.

131.  By reason of the foregoing, Plaintiff has been damaged in an amount to be proven at trial, but minimally $1,000,000 plus interest and is entitled to judgment against Defendant therefor.

### Second Cause of Action (Unjust Enrichment)

132.  Plaintiff repeats and realleges all the allegations set forth above as if set forth in full detail herein.

133.  Despite the work performed for Defendant and despite the successful completion of the IPO, Plaintiff has not received the outstanding compensation from Defendant.

134.  But for Plaintiff's work, the IPO could not have occurred.

135.  But for Plaintiff's work, Defendant would not be publicly traded on the Nasdaq, and the value of Defendants' shares would be substantially less.

136.  Defendant had a direct relationship with Plaintiff.

137.  Defendant was enriched at Plaintiff's expense.

138.  It is against equity and good conscience to permit Defendant to retain the benefits it received from the IPO when Plaintiff has not been compensated.

139.  By reason of the foregoing, Plaintiff has been damaged in an amount to be proven at trial, but minimally $1,000,000 plus interest and is entitled to judgment against Defendant therefor.

## Third Cause of Action (*Quantum Meruit*)

140. Plaintiff repeats and realleges all the allegations set forth above as if set forth in full detail herein.

141. In the alternative, should the Agreement somehow be determined unenforceable for any reason, Defendant is liable to Plaintiff under *quantum meruit*.

142. Plaintiff performed its services in good faith.

143. Specifically, Plaintiff provided advisory services to Defendant in the areas of corporate development and corporate finance.

144. Plaintiff advised Defendant on the Nasdaq application and responding to comments from Nasdaq.

145. Ultimately, Plaintiff performed most of the work that was performed leading up to the IPO.

146. Defendant accepted these services.

147. Defendant knew that Plaintiff had a reasonable expectation of compensation for its services.

148. The reasonable value of the services Plaintiff provided is $1,000,000 plus interest.

149. By reason of the foregoing, Plaintiff has been damaged in an amount to be proven at trial, but minimally $1,000,000 plus interest and is entitled to judgment against Defendant therefor.

## Fourth Cause of Action (Breach of the Covenant of Good Faith & Fair Dealing)

150. Plaintiff repeats and realleges all the allegations set forth above as if set forth in full detail herein.

151. Defendant agreed to abide by the terms of the Agreement.  Implied in this contractual relationship was Defendant's covenant of good faith and fair dealing.

152.  Defendant's actions as set forth above, including but not limited to its acceptance of Plaintiff's efforts and performance and its failure to remit payment in return as set forth in the Agreement, breached this implied covenant of good faith and fair dealing.

153.  Defendant's breach has caused and is causing substantial and imminent harm and damage to Plaintiff.

154.  By reason of the foregoing, Plaintiff has been damaged in an amount to be proven at trial, but minimally $1,000,000 plus interest and is entitled to judgment against Defendant therefor.

### Fifth Cause of Action (Common Law Fraud)

155.  Plaintiff repeats and realleges all the allegations set forth above as if set forth in full detail herein.

156.  Defendant knew that Plaintiff would not start work unless the deal included some guarantee of some payment in the event of an unsuccessful IPO.

157.  Defendant promised a "floor," so that no matter what, Plaintiff would receive some compensation.

158.  At the time Defendant promised the floor of 75%, the Defendant knew it had no intent of paying Plaintiff anything.

159.  At the time, Defendant actually intended to use Plaintiff to do almost everything needed to IPO, and then to switch investment banks at the last minute and not pay Plaintiff anything.

160.  Defendant knew its promise of a Floor was false, and made it because it knew how important it was to Plaintiff.

161.  Defendant promised a floor in order to induce Plaintiff's reliance, and it worked.

162.  Plaintiff reasonably relied on Defendant's promise of a Floor of 75%.

163.    But for this "floor" payment, Plaintiff never would have spent so much time working on Defendant's IPO.

164.    On April 15, 2021, the parties met in person instead of over Zoom.

165.    Jonathan Blum and Gregg Jaclin met with Joe Hayon and Dagi Ben-Noon at Del Friscos Double Eagle Steakhouse in New York at 6pm on April 15, 2021.

166.    They were at dinner for about 2 hours.

167.    At about 6:45 Miri Segal from MS-IR, LLC joined the parties for dinner.

168.    This firm handled IR for Inspira and Miri Segal was the main point of contact at the firm.

169.    The reason that Joe Hayon and Dagi Ben-Noon came to New York was to meet both with Benchmark as well as National Securities Corp. ("National").

170.    Defendant had terminated Benchmark for failure to close the IPO, and were looking to engage National as their new banker.

171.    Plaintiff arranged a meeting for Defendant with Mike Jacobs at Benchmark during this trip, because the parties were trying to figure out a way Benchmark could still participate in the IPO as a syndicate member.

172.    The dinner was very amicable.

173.    The parties spent a good amount of the time talking about Israel, Joe Hayon and Dagi Ben-Noon's time in the Israeli Army, and their families.

174.    The parties also spoke about the upcoming IPO, and moving forward with National or another banker.

175.    The parties spoke about the underwriter counsel that Plaintiff had arranged for, Lucosky Brookman, LLP ("Lucosky"), because Defendant wanted to keep Lucosky as underwriter counsel.

176.   Lucosky had acted as Benchmark's counsel, and Defendant thought it would be seamless to slide in a new underwriter as long as the new underwriter used the same underwriter counsel.

177.   Plaintiff agreed to assist with this, and did so.

178.   Lucosky acted as counsel for National.

179.   The parties also discussed the success fee Defendant would owe to Plaintiff if the IPO in fact successfully closed, but with National or another banker as opposed to one introduced by Plaintiff.

180.   There was some disagreement, as Plaintiff understood that they would be entitled to a full success fee if the deal was successful.

181.   Joe Hayon stated that Plaintff would get 75%, and not 100%, of its fees, since Plaintiff had not introduced the "final" banker for the deal.

182.   Joe Hayon stated that Plaintiff would receive approximately 75,000 Ordinary Shares.

183.   Plaintiff believed it was entitled to more, but did not want to fight at the dinner.

184.   Joe Hayon stated that Plaintiff should continue helping him build towards the upcoming IPO.

185.   Hayon promised 75,000 shares if Plaintiff kept working on the IPO.

186.   This was false and known to be false by Hayon when he said it.

187.   Hayon told this to Plaintiff with the intent of inducing Plaintiff to rely on the statement and to keep providing services for free.

188.   Plaintiff justifiably relied on this statement, as it was later backed up by the public filing (see Ex. 1).

189.   But for the statement at dinner, Plaintiff would have stopped working on the IPO.

190.   But for the confirmation of the dinner's misrepresentation, Plaintiff would have stopped working on the IPO.

191.   Plaintiff (and all investors) should be able to rely on the truth of an F-1 filed by a company in connection with its IPO.

192.   Here, the misrepresentation caused Plaintiff to continue providing services over the next few months.

193.   The F-1, on pg. 59, was written confirmation of this misrepresentation, as 73,321 is clearly, approximately 75,000.

194.   Plaintiff suffered damages in the form of hours worked for no pay.

195.   These damages were caused by Defendant's misrepresentation and omission.

196.   Defendant knew that Plaintiff had a reasonable expectation of compensation for its services.

197.   The reasonable value of the services Plaintiff provided is $1,000,000 plus interest.

198.   Minimally, Plaintiff was told it would receive approximately 75,000 shares, and then the F-1 confirmed this, with the figure 73,321 shares.

199.   By reason of the foregoing, Plaintiff has been damaged in an amount to be proven at trial, but minimally $1,000,000 plus interest and is entitled to judgment against Defendant therefor.

### Sixth Cause of Action (Breach of Written Contract)

200.   Plaintiff repeats and realleges all the allegations set forth above as if set forth in full detail herein.

201.   The Agreement (Exhibit 2) is a valid, binding and enforceable contract.

202.   Plaintiff performed its obligations under the Agreement.

203.   Defendant accepted the performance and the results of Plaintiffs efforts, and admitted publicly that Defendant owed shares to Plaintiff, but has not made any payment to Plaintiff.

204.   The lack of payment to Plaintiff constitutes a breach of contract.

205.   The cash total owed to Plaintiff is $95,000 plus interest.

206.   The total shares owed to Plaintiff is 201,000.   The shares are currently trading at slightly more than $4 per share.   Even at $4 per share, the current value of the shares is $804,000.

207.   By reason of the foregoing, Plaintiff has been damaged in the amount of $899,000 plus interest and is entitled to judgment against Defendant therefor.

**<u>Seventh Cause of Action (Breach of Oral Contract)</u>**

208.   Plaintiff repeats and realleges all the allegations set forth above as if set forth in full detail herein.

209.   The Oral Agreement reached at dinner on April 15th is a valid, binding and enforceable contract.

210.   Plaintiff performed its obligations under the Oral Agreement.

211.   Defendant accepted the performance and the results of Plaintiffs continued efforts, and admitted publicly that Defendant owed shares to Plaintiff, but has not made any payment to Plaintiff.

212.   The lack of payment to Plaintiff constitutes a breach of the oral contract reached on April 15th.

213.   On April 15th, 2021, the parties met in person instead of over Zoom.

214.    Jonathan Blum and Gregg Jaclin met with Joe Hayon and Dagi Ben-Noon at Del Friscos Double Eagle Steakhouse in New York at 6pm on April 15, 2021.

215.   They were at dinner for about 2 hours.

216.   At about 6:45 Miri Segal from MS-IR, LLC joined the parties for dinner.

217.   This firm handled IR for Inspira and Miri Segal was the main point of contact at the firm.

218.   The reason that Joe Hayon and Dagi Ben-Noon came to New York was to meet both with Benchmark as well as National Securities Corp. ("National").

219.   Defendant had terminated Benchmark for failure to close the IPO, and were looking to engage National as their new banker.

220.   Plaintiff arranged a meeting for Defendant with Mike Jacobs at Benchmark during this trip, because the parties were trying to figure out a way Benchmark could still participate in the IPO as a syndicate member.

221.   The dinner was very amicable.

222.   The parties spent a good amount of the time talking about Israel, Joe Hayon and Dagi Ben-Noon's time in the Israeli Army, and their families.

223.   The parties also spoke about the upcoming IPO, and moving forward with National or another banker.

224.   The parties spoke about the underwriter counsel that Plaintiff had arranged for, Lucosky Brookman, LLP ("Lucosky"), because Defendant wanted to keep Lucosky as underwriter counsel.

225.   Lucosky had acted as Benchmark's counsel, and Defendant thought it would be seamless to slide in a new underwriter as long as the new underwriter used the same underwriter counsel.

226.   Plaintiff agreed to assist with this, and did so.

227.   Lucosky acted as counsel for National.

228.   The parties also discussed the success fee Defendant would owe to Plaintiff if the IPO in fact successfully closed, but with National or another banker as opposed to one introduced by Plaintiff.

229.   There was some disagreement, as Plaintiff understood that they would be entitled to a full success fee if the deal was successful.

230. Joe Hayon stated that Plaintff would get 75%, and not 100%, of its fees, since Plaintiff had not introduced the "final" banker for the deal.

231. Joe Hayon stated that Plaintiff would receive approximately 75,000 Ordinary Shares.

232. Plaintiff believed it was entitled to more, but did not want to fight at the dinner.

233. Joe Hayon stated that Plaintiff should continue helping him build towards the upcoming IPO. As consideration Mr. Hayon offered a minimum amount, or floor, of approximately 75,000 Ordinary shares.

234. Blum and Jaclin accepted this verbal offer while at the dinner, and continued providing services as consideration for the approximately 75,000 Ordinary Shares over the next few months.

235. The F-1, on pg. 59, was written confirmation of this oral agreement reached during the April 15th dinner – 73,321 is, clearly, approximately 75,000.

236. The remainder of the conversation was more of what was usually discussed in the Zoom meetings –  how Plaintiff could continue to assist with the IPO, since there was a new verbal agreement.

237. Plaintiff paid for the meal, which it plainly would not have done if there was any hint that Defendant was planning on refusing to pay Plaintiff.

238. Everything seemed to going well in the lead up to the IPO.

239. In fact, Defendant sent a WhatsApp to Jonathan Blum and Gregg Jaclin on July 13th to let Plaintiff know that the IPO had closed.

240. Jonathan Blum then spoke to Joe Hayon shortly after the IPO closed, and Joe Hayon stated that the shares and cash would be sent one week later.

241. Blum sensed that he and Hayon were celebrating after Plaintiff had delivered a successful IPO for Defendant – which, of course, it had.

242. There was nothing in the conversation to indicate that Plaintiff was not going to be paid.

243. The payment, however, never came.

244. Plaintiff suffered damages in the form of hours worked for no pay.

245. These damages were caused by Defendant's misrepresentation and omission.

246. Defendant knew that Plaintiff had a reasonable expectation of compensation for its services.

247. The reasonable value of the services Plaintiff provided is $1,000,000 plus interest.

248. Minimally, Plaintiff was told it would receive approximately 75,000 shares, and then the F-1 confirmed this, with the figure 73,321 shares.

249. By reason of the foregoing, Plaintiff has been damaged in an amount to be proven at trial, but minimally $1,000,000 plus interest and is entitled to judgment against Defendant therefor.

### Eighth Cause of Action (Attorneys' Fees)

250. Plaintiff repeats and realleges all the allegations set forth above as if set forth in full detail herein.

251. Plaintiff seeks from Defendant attorneys' fees, pursuant to Section 11(B) of the contract (see Exhibit 1).  It reads as follows:

B.    **Attorneys' Fees.**

**In the event a dispute arises with respect to this Agreement, the party prevailing in such dispute shall be entitled to recover all expenses, including, without limitation, reasonable attorneys' fees and expenses incurred in ascertaining such party's rights, in preparing to enforce or in enforcing such party's rights under this Agreement, whether or not it was necessary for such party to institute suit.**

252. Defendant's breach has caused and is causing substantial and imminent harm and damage to Plaintiff, necessitating Plaintiff to incur ongoing attorneys' fees.

253.    By reason of the foregoing, Plaintiff has been damaged in an amount to be demonstrated after trial, plus interest, and is entitled to judgment as against Defendant for attorneys' fees.

**WHEREFORE**, Plaintiff demands judgment as follows:

(a) in Plaintiff's favor and against Defendant on the First Cause of Action in the amount of $1,000,000 plus interest at the legal rate;

(b) in Plaintiff's favor and against Defendant on the Second Cause of Action in the amount of $1,000,000 plus interest at the legal rate;

(c) in Plaintiff's favor and against Defendant on the Third Cause of Action in the amount of $1,000,000 plus interest at the legal rate;

(d) in Plaintiff's favor and against Defendant on the Fourth Cause of Action in the amount of $1,000,000 plus interest at the legal rate;

(e) in Plaintiff's favor and against Defendant on the Fifth Cause of Action for an amount to be proven at trial, but not less than 73,321 Ordinary Shares or their cash equivalent;

(f) in Plaintiff's favor and against Defendant on the Sixth Cause of Action for $899,000 plus interest at the legal rate;

(g) in Plaintiff's favor and against Defendant on the Seventh Cause of Action for an amount to be proven at trial, but not less than 73,321 Ordinary Shares or their cash equivalent;

(h)  in Plaintiff's favor and against Defendant on the Eighth Cause of Action for an amount to be demonstrated after trial, plus interest, as against Defendant for attorneys' fees; and

(i)  for such other and further relief as the Court may deem just and proper.

Dated: New York, New York
   October 15, 2021

            PULLP


       By:  <u>/s/ Jon Uretsky</u>
          Jon Uretsky, Esq.
          PULLP
          111 Broadway, 8th Floor
          New York, New York  10006
          (212) 571-1255
          *Attorneys for Plaintiff*